UNITED STATES of America,
Appellee,

v.

Simon SILVERMAN, a.k.a. Sid Taylor,
Joseph Dimow, Robert Champion
Ekins, Jacob Goldring, and Martha
Stone, a.k.a. Mrs. Emil Asher, Defend-
ants-Appellants.

No. 195, Docket 24126.

United States Court of Appeals
Second Circuit.

Argued Jan. 8, 1957.

Decided Sept. 11, 1957.

On Petition for Rehearing before the
Court En Banc Oct. 25, 1957.

Hincks, Circuit Judge, dissented.

See also 132 F.Supp. 820.

Frank J. Donner, New York City, Thomas I. Emerson, New Haven, Conn., and George F. Lowman, Stamford, Conn. (Joseph Mitchell Kaye, Greenwich, Conn., on the brief), for defendants-appellants.

Simon S. Cohen, U. S. Atty., Dist. of Conn., Hartford, Conn., and William F. O'Donnell, III., Atty., Dept. of Justice, Washington, D. C. (Francis J. McNamara, Jr., Asst. U. S. Atty., New Haven, Conn., and Harold D. Koffsky and John C. Keeney, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before CLARK, Chief Judge, and HINCKS and WATERMAN, Circuit Judges.[1]

CLARK, Chief Judge.

The five defendants herein appeal from a judgment of conviction after verdict of a jury on charges of having conspired to violate the Smith Act, 18 U.S. C. §§ 2385, 371, by "unlawfully, wilfully and knowingly advocating and teaching the duty and necessity of overthrowing and destroying the Government of the United States by force and violence, with the intent of causing the aforesaid overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit."[2] Three other defendants were also indicted; of these the jury acquitted one and disagreed as to another, while the third, who was convicted, has not appealed his suspended sentence.

Among other allegations of error appellants claim that they were unconstitutionally compelled to stand trial to a jury despite their strenuous efforts to waive that form of trial; they were prejudged by the congressional findings in the Communist Control Act, 50 U.S.C. § 841; and their speech did not constitute a "clear and present danger," as defined in Supreme Court precedents. We do not decide these far-reaching issues, however, because we hold the evidence insufficient to establish the first element of the crime charged: the conspiratorial agreement. In this opinion we shall examine, first, the precise nature and content of the agreement charged and, second, the evidence ad-duced to establish it. Finally, we shall consider the nature of our direction to the trial court in the light of our conclusion as to the evidence.

Even though we are constrained to find error, it seems desirable to say that the trial judge conducted the lengthy proceedings with outstanding dignity and the utmost fairness, in the tradition of the best American jurisprudence. And his rulings certainly had a rational basis in what then seemed to be the Supreme Court's approach and also afforded the most direct, if not the only, method of facilitating a definitive determination of the legal principles involved. That the questions presented difficulty from the beginning is clear. For the case dealt with what have been termed with some reason "third-string" Communist party officials, who, with the single exception of Stone, were merely local Connecticut functionaries, and with a conspiracy limited by the statute of limitations to the period March 1952 to March 1955, but alleged to be part of the continuing national conspiracy found in other cases to have been formed in 1945. The chains of connection with the heart of the often recognized Communist conspiracy are thus much longer and decidedly more tenuous than in the other cases we have had. The problem thus presented has been clarified since the conclusion of the trial by the very recent decisions of the Supreme Court, notably Yates v. United States, 77 S.Ct. 1064, 1073–1085, requiring for a conviction proof of an "advocacy of action," rather than "advocacy or teaching of abstract doctrines, with evil intent." We do not find here evidence of the necessary incitement to action.

1. The appeal was originally argued before a panel consisting of Judges Clark, Lumbard, and Waterman; upon Judge Lumbard's disqualifying himself, Judge Frank was substituted; upon Judge Frank's death, Judge Hincks was added.

2. Since its original enactment in 1940 the Smith Act has undergone some amendment, not affecting our discussion herein, but concerning in part its connection with the general conspiracy statute, 18 U.S.C. § 371. These changes are set forth in Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1067, n. 1, 1 L.Ed.2d 1356. The final words quoted in the text from the indictment, "as speedily as circumstances would permit," are not found in the statute. An earlier indictment had been dismissed for irregularities in the selection of the Grand Jury. United States v. Silverman, D.C.Conn., 129 F. Supp. 496.

Our discussion will follow the following outline:

I. THE AGREEMENT CHARGED

A. The Persons Involved.
B. The Aim of the Conspiracy.

II. THE PROOF

A. Evidence Covering the Years 1952–1955.
B. Oral Advocacy before 1952.
C. Written Advocacy before 1952.
D. The 1945 Agreement.
E. The Revolutionary Aims of the Communist Party.

III. THE DISPOSITION OF THE CASE ON REMAND

I. THE AGREEMENT CHARGED

*A. The Persons Involved.* The indictment charged a single conspiracy embracing the eight defendants, divers persons whose names were unknown to the Grand Jury, and some identified coconspirators: Andrew Onda, Betty Gannett, Joseph Roberts, William Z. Foster, Benjamin David, Eugene Dennis, John Gates, Gilbert Green, Gus Hall, Irving Potash, Jacob Stachel, Robert Thompson, John Williamson, Henry Winston, and Carl Winter. The role of these various defendants and named coconspirators can be appreciated only against the background of the Party hierarchy. Actually two hierarchies were involved, one state and one national, with the former responsible to the latter. By and large the defendants were involved in the state hierarchy, and the named coconspirators were involved in the national structure. Both state and national groups were overhauled in 1945 when they changed their name from political associations to parts of the Communist party; this event is the commencement of the conspiracy charged in the indictment.

The highest body in the reconstituted national party was the National Convention, but it met only briefly at scattered intervals. Between conventions the lead-

ership groups, in descending order of importance, were the National Secretariat, the National Board, and the National Committee. Attached to them were various special organizations and boards. The only defendant who ever held a national post was the appellant Stone, who was a member of the New Jersey Delegation to the National Convention of 1948, an alternate member of the National Committee in 1951, and a member of the National Committee in 1953. Most of the named coconspirators held high national offices. Foster, Dennis, Davis, Gates, Green, Hall, Potash, Stachel, Thompson, Williamson, Winston, and Winter, according to testimony, were members of the National Board elected at the critical 1945 Convention. They were all indicted for violating the Smith Act and were convicted, with the exception of Foster, who was too ill to stand trial, in the original Dennis case in 1949, which was affirmed, United States v. Dennis, 2 Cir., 183 F.2d 201, and thereafter by the Supreme Court, 341 U.S. 494, 71 S.Ct. 857, 95 L. Ed. 1137. These Dennis case leaders and coconspirator Elizabeth Gurley Flynn were elected to the National Committee at the same convention. Flynn's conviction in 1952 for violating the Smith Act by conspiring with the Dennis case conspirators was affirmed in United States v. Flynn, 2 Cir., 216 F.2d 354, certiorari denied Flynn v. United States, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713.

Coconspirator Onda was a delegate to the 1945 National Convention, where he represented the Communist Political Association in Connecticut. Coconspirator Gannett was the Assistant Organizational Secretary to the national organizational director of the Party from 1945 until at least 1950. Coconspirator Roberts was business manager of the publication The Daily Worker in 1947.

The Communist Party of the State of Connecticut was organized in the same fashion, with a secretariat, board, committee, and convention. The only named coconspirators active in it were Onda and Roberts. The former was the top

leader of the State Party in 1945 and the latter was a District Organizer in Connecticut. Appellant Taylor (Silverman) was State Secretary from 1945 to 1950, when he became State Chairman —a post he held at the time the indictment was returned. Appellant Ekins became State Secretary in 1950 and held that post until 1954. Appellant Goldring was a member of the State Committee at various times from 1946 through 1954, was State Financial Secretary, Treasurer, and Press Director in 1949, and was State Executive Secretary in 1954. Taylor, Ekins, and Goldring were members of the State "concealed Board." Appellant Dimow held local offices in Connecticut from 1946 to 1949 and was a member of the State Committee in 1953 and 1954.

The interconnection of the state and national officers is an important question of proof, and we shall discuss it below in that context. But the evidence of connection must be noted here, too, in defining the issue presented by the charges. As the evidence developed, the national leaders were shown to have supervised operations within the state apparatus; and various persons in the conspiracy on the national level were shown to have met other persons involved in Connecticut affairs. Thus appellant Stone, although on the national level, met appellant Taylor, a state level leader, at several meetings in Connecticut in 1952 and 1953. Stone directed the concealed activities of the Connecticut Party at a time when appellants Taylor, Ekins, and Goldring were members of a concealed State Board. Coconspirator Gannett, in the national hierarchy, appeared at a state party meeting sponsored by appellant Taylor; and a former Connecticut State Chairman served at one time as Gannett's assistant. To take one out of innumerable instances in the record of liaison between state and national organization, Nat Ross from the National Office of the Party spoke once at a State Seminar in praise of the work of Joseph Stalin. The record contains scores of names of persons who held office or taught classes for the Party between 1930 and 1955 in various parts of the United States; and the jury was invited to believe that they, too, were part of the same single national conspiracy in which the defendants engaged between 1952 and 1955.

The Government's contention was that the defendants were "after-joiners" who either joined the Party after it was reconstituted or remained in it after learning the significance of its reorganizations.[3] None of the defendants participated in the 1945 reorganization of the national party, although most of the identified coconspirators were at that convention. The only defendant to participate in the Connecticut reorganization was appellant Goldring, who attended the 1945 State Convention which approved the decision of the national group and emulated it. Appellant Dimow joined the Party in 1946; the other appellants had been members of the Party long before the 1945 reorganization: Stone since 1933; Ekins since 1937; Taylor since 1939; and Goldring since 1941.

Normally a conspiracy indictment need not fail if proof is lacking to implicate some of the defendants or coconspirators charged. See, e. g., United States v. Cioffi, 2 Cir., 242 F.2d 473, 475, certiorari denied Cioffi v. United States, 353 U.S. 975, 77 S.Ct. 1060, 1 L.Ed.2d 1137. Under the circumstances here, however, a reversal would be necessary if the prosecution failed to prove its charge that the appellants were in league with the top echelon Communist party leaders convicted in the Dennis case. By linking the defendants with such notorious persons serious harm was done

---

3. The indictment alleged a conspiracy to organize, as well as to teach and advocate; and evidence of organizational activity was admitted. But the organizing count did not go to the jury, having been dismissed as barred by the statute of limitations. The evidence of organizing was not stricken, it being relevant to the conspiracy to teach and advocate.

to their chances of acquittal. Whole volumes of highly inflammatory testimony about persons whom the defendants had never met were admitted into evidence on the Government's representation that these other persons would be shown to be coconspirators. Thus the statements, deeds, and aims of the top echelon national leaders were paraded before the jury; and Government witness John Lautner's career in other parts of the country between 1929 and 1950 was traced in detail—all on the assumption that these facts were relevant to a huge national conspiracy in which the Dennis case leaders were the hub, and the Connecticut state hierarchy one of many identical spokes. These lines of testimony were neither brief nor merely cumulative nor easily forgotten. Hence the conviction cannot stand without a showing that the defendants and at least some of the persons involved in the Dennis case were part of the same conspiracy. Yates v. United States, supra, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356; Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557.

■■■■ *B. The Aim of the Conspiracy.* We seek to define the precise aim of the conspiracy charged by the Grand Jury, mindful of the Supreme Court's recent warning that it "will view with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions" by loose definition of conspirators' goals. Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 974, 1 L.Ed.2d 931. The indictment alleges an agreement to utter the kind of dangerous speech prohibited by the Smith Act. We mention this obvious fact because of the ease with which this crime may be accidentally confused with the superficially similar offense of conspiring to overthrow the Government by force and violence. The latter is forbidden by 18 U.S.C. §§ 2383 and 2384; the present indictment concerns the Smith Act, 18 U.S.C. § 2385. In this case it would not be enough to show that the defendants were serious revolutionaries who plotted to take part in a

bloody insurrection; there must be a further showing of illegal speech. It is the speech element which distinguishes the Smith Act from other criminal controls on subversive activities and which has caused the Supreme Court to narrow the statutory language to avoid a construction which would violate the First Amendment. Turning then to the Smith Act, as most recently construed by the Supreme Court, it appears that there must be proof of a plan to use language reasonably calculated to incite the audience to use violence against the Government of the United States, either immediately or in the future. Yates v. United States, supra, 77 S.Ct. 1064.

■■■ This case, like Dennis and Yates, "involve[s] advocacy which ha[s] already taken place, and not advocacy still to occur." 77 S.Ct. 1064, 1079. The Government makes no claim of "a conspiracy to engage in advocacy in the future." 77 S.Ct. at page 1080. Its position is that the conspirators actually advocated insurrection in language of the sort condemned by Yates from 1945 until the indictment in 1955. Since the statute of limitations bars prosecution for events prior to March 4, 1952, there must ultimately be proof of criminal speech after that date. To summarize, there must be proof of three things: (1) utterances after March 4, 1952; (2) that the utterances were illegal under the standard of the Yates case; (3) that they were uttered pursuant to an understanding between the appellants and some of the persons convicted in the Dennis case.

## II. THE PROOF

Before discussing particular items of evidence we shall explain the manner in which we think Yates v. United States, supra, 77 S.Ct. 1064, bears on this issue. After that decision was announced we requested counsel to submit further briefs to indicate the effect of the decision on the present appeal. In complying, counsel have quoted to us extracts from the Yates record and the Government's brief in Yates, and they suggest a point-by-point comparison of the facts

in Yates with the present facts. For at least two reasons we are constrained to reject this approach. First, the standard of sufficiency of the evidence applied by the Supreme Court to determine whether convictions reversed for an erroneous jury charge should lead to retrial or acquittal is not the same as the criterion we are required to apply here: "In judging the record by these criteria we do not apply to these cases the rigorous standards of review which, for example, the Court of Appeals would be required to apply in reviewing the evidence if any of these petitioners are convicted upon a retrial. Compare Dennis v. United States, supra, 341 U.S. at page 516, 71 S.Ct. at page 870. Rather, we have scrutinized the record to see whether there are individuals as to whom acquittal is unequivocally demanded." Yates v. United States, supra, 77 S.Ct. 1064, 1081, 1082. Our present task is to apply the "rigorous standards of review" mentioned in Yates with "the scrupulous care" required by Dennis [341 U.S. 494, 71 S.Ct. 871]. The issue of retrial or dismissal is a matter for separate consideration hereafter.

Second, in determining whether or not the present record supports the immediate charge, we see no advantage to be gained by proceeding indirectly and considering whether this record is "weaker" or "stronger" than that in Yates. Such efforts to carry *stare decisis* into the realm of unique patterns of fact are difficult in the briefest cases and impossible here where the record below ran over 9,200 pages and the Yates record was half again as large. Each case is sufficiently distinct, so that such analyses are misleading and unhelpful. We shall proceed directly, examining the present evidence and comparing it with the charge which we have previously analyzed.

■■■ *A. Evidence Concerning the Years 1952–1955.* We resolve all issues of credibility in favor of the prosecution and draw all inferences in its favor. Even so, the single, most remarkable fact in the record is that there is no example of revolutionary advocacy of either the legal or illegal sort during the period covered by the indictment. This conspicuous failure of proof has added significance because in this period at least three Government informers who testified at the trial were in the Party in Connecticut. One of them was on the concealed State Board. They reported at the trial every possible colorable act or deed done by the defendants and their coconspirators, but no colorable behavior occurred in the critical period.

The closest approaches to advocacy which the witnesses reported in this period were two statements by persons apparently unauthorized to speak for the conspiracy. One Joe Holden, who was present at a meeting of the State Negro Commission, but who was not identified as having any position in the Party, was reported to have said that soon there would be a depression and then the Socialist revolution they all wanted. He was promptly told by the chairman of the meeting "to be careful how he expressed himself in these days." The trial judge originally admitted the hearsay, but then vacated his ruling and left it that, if additional evidence appeared that Holden was a coconspirator, the court would then consider whether to admit it or to strike it. No additional evidence appeared. One Josephine Willard, a member of the Bridgeport City Committee, was reportedly called to recite as a pupil at an educational class on the subject of the Party's attitude toward colonialism; she remarked that "the Communists would support the masses of people in any country who were revolting to throw off the yoke of the capitalists and assist these people in establishing a democratic form of government." There was a total dearth of evidence that the Marxist classics were read, discussed, or disseminated during this critical period. This is the strongest possible proof that no such advocacy in fact occurred—that witnesses in a perfect position to observe could find nothing to report.

The Government witnesses admitted that during these years the defendants and their coconspirators were engaged in political advocacy, both within the ranks of the Party and to outsiders. The propaganda they distributed consistently decried violence and supported conventional goals of economic change and social reform. The jury, in order to convict, was asked to find that the legal advocacy was only a blind and that, unobserved by the FBI agents in their midst, the defendants used forbidden language. Three lines of circumstantial evidence were presented to support this somewhat strained inference. First, the conspirators allegedly engaged in such concerted and repeated illegal advocacy in the period shortly after the formation of the conspiracy in 1945 that the jury could infer continuation of such advocacy after March 1952. This approach is allegedly supported by examples of illegal oral remarks and the teaching of illegal written texts prior to 1952. Second, an agreement to advocate the use of force was allegedly reached between the Connecticut and national leaders at the 1945 reconstituting convention. And third, there was an alleged conspiracy to overthrow the Government in the future, from which the jury could infer a conspiracy to advocate such overthrow presently.

*B. Oral Advocacy before 1952.* We find it necessary to discuss in somewhat lengthy detail the incidents culled from the record by Government counsel as examples of defendants' illegal oral advocacy of the use of force to overthrow the Government of the United States, for in our opinion they are the heart of the case.

Quoted as the strongest single example is the testimony that appellant Stone, while an officer in the New Jersey Communist Party in 1946, attended a social gathering at which she discussed communism with a non-Communist union steward. Asked how far the Party would go in this country to obtain their objectives, Stone replied, "Frankly, Amie, if necessary we'll have bloodshed."

This was in the presence of a person introduced as the President of the Communist party in New Jersey. Subsequently Stone attempted to recruit the union steward into the Communist party. Stone's statement, uncontradicted by the leading New Jersey Communist, could be considered authorized by the New Jersey Party; and, in view of the uniformity of policy maintained within the state and national groups, it could also be found authorized by the national leaders of the Party. But the steward was not being urged to bloodshed, but only being asked to join a group which would take such dire steps "if necessary." This is a far cry from advocating and teaching the duty and necessity of overthrowing the Government of the United States, which is the crime charged in the indictment.

The second most damning statement was probably that of appellant Goldring to the Government witness Gay in the latter part of 1946. Goldring and Gay were state and local officers in the Communist party in Connecticut at that time; and both worked in the same section in the General Electric plant, meeting daily during rest hours, lunch, or regular working hours. On one occasion they were discussing Marxist-Leninist theory, and Goldring expressed himself thus:

"He stated to me that the Communism in the United States could never be achieved through the use of the ballot; that the capitalistic system would never give up without a struggle, and that he agreed with the Marxist-Leninist theory that Communism would be achieved either through an internal revolution or through the conversion of the imperialist war into one of a revolutionary nature. * * *

"He stated that the Communist Party would be the leader, in the leadership in the changing of the character of an imperialist war."

Here again the statement is good proof of the specific intent of Goldring, but it is not an example of incitement. The speaker was expressing his personal prognostication as to the way communism would be achieved; he was not try-

ing to convince his hearer, a personal friend, to use force and violence himself.

A third incident occurred in 1945 at a meeting called to consider whether Connecticut's Communist Political Association should repudiate Browderism and take a more leftist course, as suggested in the Draft Resolution proposed by the Dennis case defendants. As will be discussed below, the Draft Resolution contained no approval of force and violence, although it did approve the idea of class war and "Marxism-Leninism." Andrew Onda, President of the state Communist Political Association, was the speaker; and he said

" * * * that Browder was guilty of revisionism, that Browder failed to look forward to the end of the war and the death of Roosevelt, and Browder had a plan for the slow gain of government control which was secretly undermining the United States Constitution by getting Party members into Government bureaus and offices where they could make drastic changes in the Government. * * *

"Well, Onda said that Browder, following such a policy, had revised Marxism and Leninism in as much as it contained no revolution and it left the Communists no longer the vanguard of the working class. He said that a revolution in the Communist sense meant sudden and violent death and seizure of the Government overnight; that Browder was accused of being too kind to the capitalists.

"He said that if Browder had figured correctly he would have prepared the Party to fight Communists—Capitalism as soon as the aid of the capitalists was no longer needed."

Inasmuch as the Connecticut leaders did not join the top national leaders to launch a new course for the Party until the national convention in New York, which was held subsequent to these remarks of Onda's, they cannot be presented as examples of the conspiracy in action. If anything, the proof to be discussed later would suggest that the Connecticut leader, Onda, learned at the national convention that he had overestimated the national leaders' shift from Browderism, and that the Dennis case group was not prepared to peddle ideas as inflammatory as those of Onda. In any event, Onda's quoted statement would appear to be an argument about the proper orthodox dogma, rather than an effort to incite hearers to take action against their government.

The next incident occurred at a Communist party meeting in New Haven in 1949 attended by the defendant Resnick, Priscilla Small, and several other persons. Resnick was the defendant who was not convicted because the jury disagreed. According to the testimony he was a member of the Party, but held very minor offices on a local level. Priscilla Small was a chairman of the youth branch of the Communist party in 1949; it is not clear whether this was a local or a state office. A witness testified:

"Sidney Resnick had a discussion with another person present, and he asked the person if he thought the Communist Party would have to use revolutionary arms to achieve socialism in this country. * * *

"The other person present stated that he didn't feel it would be necessary to use revolutionary arms to achieve socialism in this country. However, if it were necessary he would certainly be willing to do so.

"Then Sidney Resnick told him that the capitalists would do anything, including arms, to prevent socialism in this country as they knew that socialism would crush them.

"Then Resnick stated that the Communist Party would have to use revolutionary arms to achieve socialism in this country, and he pointed out the example of how only Communism was achieved in Russia by revolution.

" * * * Priscilla Small interrupted Resnick and stated that he shouldn't forget that there was a potential new recruit present and that the new recruit

might get the impression that he was advocating force and violence.

"* * * Resnick told Priscilla Small that the Communist Party would have to protect their political standing as a group from the capitalists who would be using force and violence against them and, therefore, they would have to use arms to protect themselves."

Passing the question whether Resnick's doctrine of the necessity of using arms in self-defense violates the Smith Act,[4] the incident suggests that Resnick's effort to incite the use of force not only was unauthorized by the party leaders' secret agreement, but was directly contrary to it.

Several of the incidents proffered by the Government, although perhaps relevant to show the specific intent of an individual conspirator, are too remote to be considered as examples of carrying out the conspiracy charged. For example, there was testimony that at a Communist party meeting in Chicago in 1948, attended by the defendant Tate, one Fred Fine spoke. Fine was an organizational secretary of the District of Illinois and an alternate member of the National Committee. He was discussing the sale of tickets to a mass rally where Henry Wallace was to speak, and according to the witness:

"He said that from the sale of the tickets, all indication—there are indications that the people are dissatisfied with the present conditions, and they are looking for new leadership.

"He said that the Communist Party must be prepared to give these people leadership so that they will—to prevent the rise of fascist regime.

"He compared this situation with a grain elevator. He says when a grain elevator is improperly packed, it causes spontaneous combustion, and explosion will result of it.

"He says that when this explosion occurs, the Communist Party must be ready to furnish the people with leadership to overthrow the capitalistic government and replace it with a farm-labor government, farmers-workers government."

Even more remote are the examples of Communist teachings prior to the alleged formation of the conspiracy in 1945. If written, as well as oral, evidence of this sort is considered, this line of proof runs back to the day in 1848 when Marx and Engels published The Communist Manifesto. These incidents were not admitted as proof of the execution of the secret agreement, however, but for two very limited purposes: *"First,* to afford an opportunity for the offering of proof as to what was meant by the claimed 'reconstitution of the Communist Party' and what was meant by the claimed return 'to the principles of "Marxism-Leninism"' as those words and phrases were used in the testimony, in particular concerning the National Convention of the Communist Political Association in New York in July 1945 and, in general, concerning the nature, aims, objects and purposes of the alleged conspiracy from April 1945 to March 4, 1955. In other words, it is necessary to go back of 1945 to learn how the Communist Party was originally constituted and what it formerly stood for in order to find out what kind of a party it was and the nature and purposes of the party which was *re*constituted in July of 1945 and similarly it is necessary to go back of 1945 to learn what Marxism-Leninism is, the principles of which are alleged to have been returned to in July 1945. Evidential materials prior to April 1945, including books and other writings, some of which go back to 1848, are to be considered by you only for the purpose of determining how they were interpreted and used by the defendants and other alleged co-conspirators (if you

---

4. The district judge in his charge to the jury took the position that it could not convict for advocating force against some possible future government of the United States which "denied the right of the majority of the people to remove it from power by the peaceful, democratic means provided under our present constitution."

find they were so used) in furtherance of the alleged conspiracy during its claimed existence, that is from April 1945 to March 5, 1955. \* \* \*'' The *second* purpose was to show the specific intent of the speaker. We consider this evidence in our discussion of the second and third lines of proof.

The remaining statements fall into several innocuous classes. Some express approval of the dictatorship of the proletariat, but do not suggest how it should be brought to pass. Some announce broadly that capitalism must be destroyed. Others suggest that there is inevitable antagonism between the classes, but do not say that force will be needed to resolve it. There remain some innuendoes that "overthrow" is desirable or inevitable, phrased in noninflammatory terms. Thus a teacher once stated at a Party class in Connecticut that "Fascism could also be prevented \* \* \* by the working class led by the Communist Party taking action at the proper time to overthrow the present system of government." Another Party teacher at a class attended by Sid Taylor "made a statement that Socialism is inevitable only if we Communists fight for it. And he said Socialism is inevitable because we Communists will fight for it."

 These statements, individually and collectively, are "[t]hat sort of advocacy [which], even though uttered with the hope that it may ultimately lead to violent revolution, is too remote from concrete action to be regarded as the kind of indoctrination preparatory to action which was condemned in Dennis. As one of the concurring opinions in Dennis put it: 'Throughout our decisions there has recurred a distinction between the statement of an idea which may prompt its hearers to take unlawful action, and advocacy that such action be taken.' \* \* \* The essential distinction is that those to whom the advocacy is addressed must be urged to *do* something, now or in the future, rather than merely to *believe* in something." Yates v. United States, supra, 77 S.Ct. 1064, 1078, 1080.

*C. Written Advocacy before 1952.* The Government urges that the forbidden advocacy was accomplished by the study and dissemination of certain books —the Marxist-Leninist classics—consisting of the works of Marx, Engels, Lenin, and Stalin. The conspirators encouraged the rank and file members to read these works, but there is no showing that stress was laid on the passages in the books which advocate the use of force and violence against the Government of the United States. The books fill a veritable library and contain ideas on almost every other aspect of the social sciences, as well as the means whereby a dictatorship of the proletariat can be achieved. On the last subject the different writers, expressing themselves in different times, countries, and contexts, had different ideas. Admittedly Marx wrote that the dictatorship of the proletariat could be accomplished in this country by the ballot. And admittedly Stalin wrote that the United States, at least during the period when capitalistic nations encircled Russia, required a bloody revolution, and not a peaceful one. Stalin's book, The Foundation of Leninism, was among those listed in the outline prepared by the national leaders for study by members; the book was discussed in Connecticut, but it was not shown that the discussion concerned this particular passage. The prosecution filled pages of the record with selected passages from all these works suggesting that the transition to socialism would be violent. The defense introduced other selected passages suggesting a peaceful transition. Neither side denied that the works contained both kinds of passages.

 Thus the question emerges: Was it a violation of the Smith Act willfully to belong to a group that studied and recommended books which contained, *inter alia,* the notion that it is necessary to use force to overthrow the government of this country? We think not where, as here, there is no showing that that particular doctrine was culled out for emphasis. Without such emphasis there is only the dissemination of Marx-

ist-Leninist literature—a body of writing as varied and contradictory as are most serious collections of thought put together by many hands in different countries and times. While some strands are so common to all the Marxist literature that they can be equated with it, the notion that force and violence must be used against the Government of the United States is not such a strand. Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796. Similarly no reasonable jury could infer that the Gideon Society is conspiring to advocate the *lex talionis* merely because that idea is contained in some parts of the Bibles they distribute.

We find no examples of advocacy of the forbidden kind, either oral or written, by any Connecticut Communist in the years subsequent to the formation of the conspiracy. The failure to produce instances of such speech or teaching in these years is most significant, for during that period the Communist party in Connecticut was thoroughly infiltrated by Government informers, who testified at the trial. Ronald Gay, the first Government witness, had been a Party member from 1943 to 1948 and had been a member of the State Committee, the State Executive Board, and the State Youth Commission. Worden C. Mosher was a member from 1939 to 1950; when he was relieved of his duties as Financial Secretary. His son, Harold Mosher, was a member of the Party in Connecticut from 1947 to 1950. Both Moshers joined the Party as FBI undercover agents. Harold Kent joined the Party in 1949 and began working for the FBI within the Party in 1952. He continued to be in the Party until 1954. He was a member of the State Negro Commission and eventually became a member of the concealed State Board. Antonio Pires joined the Party as an FBI undercover agent in 1952 and attended both elementary and advanced classes in Marxism. Rowena Paumi joined the Party in the 1940's and remained in it as an FBI informer until the time of the trial, cultivating extensive social contacts with the defendants and other Communists. Most of these informers reported regularly to the FBI and prepared thoroughly for the trial, minimizing the likelihood that inflammatory remarks occurred in their presence which were not introduced in evidence.

D. *The 1945 Agreement.* Since the Government informers, in the best possible position to observe, failed to note a single example of a Connecticut Communist engaged in illegal advocacy between the formation of the conspiracy and the filing of the indictment a decade later, it would seem that the negative had been established as completely as possible and that the jury could conclude only that no illegal advocacy in fact occurred. But it is not absolutely impossible that isolated examples of speech went unnoticed by the FBI; and we turn to circumstantial proof of such instances, with the caveat that the circumstantial proof would have to be most persuasive to overcome such direct negative evidence. The prosecution's second line of proof was that the conspirators in 1945 agreed to indoctrinate the rank and file members in the use of force and violence, from which the jury was to infer that the agreement was executed between 1952 and 1955.

The jury could have found that in 1944 Earl Browder caused the dissolution of the Communist party and the formation of the Communist Political Association; that William Z. Foster wrote a letter to members of the new National Committee criticizing the dissolution of the Party, but that the letter was suppressed; that in May 1945 Jacques Duclos, general secretary of the French Communist Party, condemned the C. P. A.'s policy of class peace; and that Duclos revealed the Foster letter to the Party rank and file. Subsequently, in June 1945, William Z. Foster and several of the Dennis case defendants, who were members of the National Board of the C. P. A., adopted a Draft Resolution criticizing the Browder period and praising the Duclos article. A special national convention was called for July 1945 to

consider the Duclos article. In June and July in Connecticut, as elsewhere, local Communist groups discussed the Duclos article and the Draft Resolution. Andrew Onda, President of the Connecticut C. P. A., spoke out strongly against the Browder period and favored "return to Marxism-Leninism." At another meeting Onda expressed himself as favoring a "revolution" which he equated with violent death and the seizure of the Government overnight.

The Connecticut state committee eventually endorsed the Draft Resolution and the state convention similarly endorsed it, electing Onda to represent the state at the national convention which was to be held July 26–28, 1945, in New York City. At the national convention strict secrecy was the order of the day and only one hundred picked Communist leaders attended. They unanimously voted to adopt the Draft Resolution and to reconstitute the Party with Foster at the head. Many of the Dennis case defendants were elected to high office at this time. The national delegates also adopted a constitution which dedicated the Party to "the principles of scientific socialism, Marxism-Leninism."

The Draft Resolution is conspicuously free of any suggestion that the Party approved of inciting revolutionary force and violence. The Resolution was concerned with developing "the broadest national coalition of all anti-fascist and democratic forces"—for the war with Japan was still on and Russia and the United States were military allies. The Party's domestic goals, far from violent revolution, were an immediate 20 per cent wage increase, the guaranteed annual wage, extended unemployment insurance benefits, public works, price and rent controls, extended social security, state and federal aid to farmers, the G. I. Bill of Rights, elimination of anti-Negro discrimination, antitrust prosecutions, etc.

The Resolution also discussed the significance of the change from the C. P. A. under Browder to the reconstituted Communist party. It condemned Browder for believing that after the defeat of Germany big capital would help the working class to maintain postwar national unity; for believing in the possibility of achieving national liberation of colonial countries through arrangements between the big powers; for arousing "tendencies to obscure the class nature of bourgeois democracy, to false concepts of social evolution and to minimizing the independent and leading role of the working class." It concluded with the exhortation, "We must wage a resolute ideological struggle on the theoretical front, enhancing the Marxist understanding of our entire organization and leadership."

The Constitution adopted at that time was even less incriminating. It dedicated the Party to the defense of the Bill of Rights and to the ultimate establishment of socialism by the free choice of the majority of the American people. Other provisions punished members who conspired to overthrow the Government by force and violence. While the jury was not bound to find that these provisions were enforced, it could not infer from them an agreement to use force and violence against the Government.

Nor did the speeches of Foster and the other leaders at the convention intimate that the peaceful nature of the official documents was a facade for neophytes concealing a more sinister agreement among the initiated. While the speeches indicated that the Party retained its belief in class antagonism and the need for the eventual proletariat dictatorship, there was no whisper that such a state of affairs should come to pass by means other than peaceful or that the local leaders should incite their members to be willing to use violence to bring it to pass. The Government's leading witness, John Lautner, was present at the entire convention and did not recall anything to indicate a surreptitious agreement reached below the level of the words of the documents themselves. The opportunity was ideal—one hundred top leaders meeting in secret—but no agreement to advocate overthrow

was suggested by anyone; and there was unanimous acceptance of Foster's line of the united front against Fascism, with a peaceful approach to socialism.

The prosecution contended that the documents themselves contained an arcane agreement to violate the Smith Act, for they committed the Party to the principles of "Marxism-Leninism" and, according to the prosecution, the men at the convention equated these principles with inciting force and violence. To link up this line of proof there must be a showing that the Connecticut appellants understood from the term "Marxism-Leninism" that the national group was inviting or commanding them to preach violence.

There is no evidence that any Connecticut Communist expressed himself as construing the resolution in that fashion. Rather, there are suggestions in the record that the Connecticut leadership thought that the Party disapproved any talk of force, even among the membership. To establish the fact that the Connecticut Communists, including the appellants, understood the term "Marxism-Leninism" to be synonymous with advocacy of force, the Government called John Lautner to the stand as an expert on communism. Lautner's qualifications as an expert were his experience in various full-time Party jobs from 1929 to 1950, his occasional experience as a teacher of Party classes in Marxism in New York, his attendance at local and national Party schools in Marxism, and his personal conversations with Eugene Dennis, Elizabeth Flynn, and two other national leaders just prior to the 1945 convention. The relevant content of these conversations was not revealed to the jury beyond the suggestion that Elizabeth Flynn was disgusted with the way some top leaders had switched allegiance from Browder to the new controlling group. Lautner held fairly high office in the New York State Party from 1947 to 1950, but was never one of the top state or national leaders. He was never on the National Board or National Committee, but was present at the 1945

National Convention to assist in keeping out unauthorized persons.

The appellants attack Lautner's qualifications as an expert and his credibility. They attack his qualifications because he left the Party prior to 1950 and never knew them personally. Those facts would not prevent him, however, from testifying to general use of terms among Communists in 1945. They further object that he never represented the Party as a national spokesman and was not recognized as a theoretician within the Party. Such background was not necessary for him to give his opinion on this limited point. The issue of his credibility—which seems to rest on the fact that he is a full-time professional informer who has testified to the same general facts in every Smith Act case since Dennis, as well as before numerous Grand Juries, investigating committees, and boards—was properly argued to the jury and is not for us to decide. Certainly the discrepancies between his prior public testimony and his testimony in the trial below were not so great that the jury could not believe him.

Lautner did not profess familiarity with Connecticut Communists, but testified that in his experience as a member of and functionary in the Communist party from 1929 to 1950 in Ohio, West Virginia, Canada, and New York, and in the classes he attended and taught, and from his conversations with top level national leaders who attended the 1945 convention, Marxism-Leninism "was the theory and practice of the revolutionary class struggle. It was the application and practice of the teachings of Marx, Engels, Lenin, and Stalin to bring about in this era the proletarian revolution and the dictatorship of the proletariat." He further testified that the reconstitution of the Communist party in 1945 "meant giving up the—repudiating a collaborationist policy, a class-peace policy, and going back to a class-war policy." Assuming that the jury believed Lautner and that it inferred that the Connecticut Communists viewed the 1945 convention and resolution in the same way as

Lautner, it could conclude that the conspirators reached agreement at that time on the abstract doctrines of Marxism-Leninism: that the capitalists and the proletariat were hopelessly antagonistic; that the proletariat would eventually replace the bourgeoisie as the ruling class; that the working class once in power should establish a dictatorship to wipe out all vestiges of other classes.

Lautner did not equate "Marxism-Leninism" with force and violence. He did not claim that it was Aesopianism and did not suggest that the term implied that the dictatorship of the proletariat should be achieved violently. There is no basis for inferring that the Connecticut appellants understood the 1945 Resolution and Constitution to approve of the practice of inciting violent revolt.

*E. The Revolutionary Aims of the Communist Party.* The third line of proof was aimed at establishing that the Party expected to play a leading role in a future violent *putsch* against the government of this country. Lautner gave his expert opinion of the aims of the Party in the years 1929–1942 and 1945–1950:

"The ultimate aims and objectives of the Communist Party of the United States was, when given certain conditions * * * certain objective and subjective conditions on one hand when the country will find itself in a crisis, deep crisis, economic crisis, or a war situation. When a condition exists that the influence of the state, the influence of the Government * * * is on the— Is not as it used to be, when the influence of the Government and the power of the Government is ignored, or the Government cannot rule with the accepted measures, cannot carry on its functions with the accepted measures as it did prior

to this crisis, when this situation exists. And on the other hand, when the Communist Party has a decisive influence with large sections, key sections of the working class, when the Communist Party has decisive influence with allies of the working class such as farmers, the Negro people, small business men.

"When these two conditions exist the Communist Party is ready to challenge the existing order of the system as it is represented by the Government. When the Communist Party is in this condition and is ready to challenge through force and violence to overthrow the existing system of regime—

"And ready to lead through the proletarian revolution to destroy and smash the ready made state machine and establish through the dictatorship of the proletariat a new social order. When these conditions, when this situation exists, these are the ultimate aims and objectives of the Communist Party."

The jury could perhaps infer that the aims and objectives thus described by the witness Lautner were generally shared by Connecticut Communists as well as others. Corroboration for this view could be found in the Party's practice of concentrating its efforts in the labor force, its secret meetings and clandestine maneuvers, and its internal discipline.[5] When these characteristics are viewed together with the evidence already described and every inference is drawn against the defendants, it is reasonable to find that the bulk of the Party membership was in agreement on the desirability of the Party some day leading a violent insurrection against the Federal Government. From the members' continued membership despite persecution the jury could further infer

5. The prosecution stresses the proof of industrial concentration and of concealment. But these do not rationally raise any inference that the appellants engaged in a plot to advocate insurrection at the time they were hiding and seeking factory jobs. The industrial concentration possibly suggests a conspiracy to commit sabotage, espionage, or political strikes going beyond mere labor proselyting; but it does not point very directly toward illegal exhortation. Similarly, concealment is consistent with any unpopular or illegal enterprise; but the jury could not tell the nature of the enterprise from the mere fact of concealment. Once the existence of the crime were shown by other evidence, these facts might be revelant as corroboration or as to specific intent.

their willingness personally to engage in such a *putsch,* should the opportunity arrive and the signal be given.

The record would thus afford proof of seditious conspiracy or conspiracy to commit insurrection or revolution. The remaining question is whether or not the jury could infer from the conspirators' revolutionary ardor that they were presently committed to *advocating* jointly the use of violence. We think not. This line of proof at most establishes the conspirators' long-range objectives; it does not cast light on their agreement as to tactics to be pursued in the period 1952–1955. While it is certainly within the realm of fancy that men who eventually want violent insurrection will presently teach the necessity of such behavior, it is hardly strong proof of such teaching. For would-be revolutionaries are at least as likely, as an abstract proposition, to adopt the tactic in years of unpopularity of decrying the use of violence and posing as peaceful social reformers. We need not list the whole spectrum of tactics available to the conspirators, for the jury was not free to speculate as to which hypothetical course would most appeal to a group of would-be revolutionists. It was restricted to the evidence in the record, which, as previously demonstrated, pointed away from any suggestion that illegal advocacy was the tactic pursued in these years.

 Nor are the three lines of circumstantial proof sufficient when taken together. The use of lawful speech, an agreement to share abstract revolutionary doctrine, and an agreement to use force against the Government in the future do not add up to a conspiracy presently to use illegal language. The language which the appellants agreed to use and did use is undoubtedly anathema to the bulk of the American populace, but it is not unlawful. We can neither sustain their conviction for such talk nor permit the jury to draw wholly unwarranted inferences that on occasion the appellants may have slyly made much more sinister remarks. Since the proof does not establish a conspiracy to use illegal language, none of the appellants could have been a member of such a conspiracy; and all five convictions must be reversed.

 We are reluctant to upset these convictions, not because the appellants are persons who seriously and angrily criticize the most cherished American institutions—for that is their constitutional right—but because we are loath to disturb a jury's resolution of a contested factual issue. But where the jury's finding is not supported by the record it is our duty to reverse. Here, on the critical issue of whether these defendants or the Party engaged in criminal speech during the three years prior to the indictment, there is no direct evidence of a single example of such advocacy, despite ample opportunity for observation by FBI agents with access to the conspirators' innermost councils. The circumstantial proof was too full of gaps to be probative. We would mock both fair trial and free speech as meaningful constitutional guarantees were we to ignore the deficiencies of this record.

### III. THE DISPOSITION OF THE CASE ON REMAND

 In the Yates case the Supreme Court stated the criteria for deciding when Smith Act appellants whose convictions were reversed should be acquitted and when they should be compelled to stand trial again. The Court indicated that the quantum of proof required to allow the Government to retry an appellant was less than the amount needed to sustain the original conviction. Consequently, although we find the proof inadequate to support the convictions, we must still consider separately whether or not on retrial the Government could make a better showing.

As we understand the Yates decision the Supreme Court found that there was a substantial likelihood that the prosecution, given another opportunity, could establish the existence of a conspiracy smaller than the Communist party, which advocated violence to the inner circle

of initiates who comprised the concealed board. Here Government informers infiltrated the concealed state board and observed nothing even mildly incriminating. We do not know how the Government could make a better showing on retrial than it did on the first attempt. Consequently we order the district court to enter judgment acquitting all five appellants.

In this lengthy and difficult case we acknowledge the able professional assistance given us by counsel on both sides, both on the original presentation and later in analyzing the turn of events resulting from the recent decisions of the Supreme Court of the United States. In particular do we commend the fine discharge of a noteworthy burden by those lawyers who were assigned to the task by the court.

Reversed for dismissal of the indictments.

HINCKS, Circuit Judge (dissenting).

I accept the account of the agreement charged, as recited in the majority opinion and will not repeat the recitals thereof. But I cannot accept my brothers' opinion that the evidence of a conspiratorial agreement to advocate proscribed action was in any respect insufficient to support the jury's verdict. There was ample evidence of the following.

The Communist Party, U. S. A. (hereinafter referred to as the Party) was founded in 1919 on the teachings of Marx and Engels. In 1943, the Party was succeeded by the Communist Political Association (herein C. P. A.) which had been formed under the leadership of Browder, as General Secretary of the Party, to carry out the decisions arrived at by the leaders of the United States, Great Britain and Russia at Teheran.

On June 2, 1945 the National Board of C. P. A. which included co-conspirators Foster, Dennis, Williamson, Davis, Green and Thompson adopted a resolution (hereinafter referred to as the National Resolution) criticizing the Browder regime for its revision of basic Marxist-Leninist theories.

At the National Convention of C. P. A. in July 1945 it was unanimously voted to reconstitute the Party with co-conspirator Foster as its head and other co-conspirators were elected to the National Committee or the National Board. A Constitution was adopted which dedicated the Party "to the principles of scientific socialism, Marxism-Leninism." It is true that the Constitution ostensibly called for the "establishment of socialism by the free choice of the majority of the American people." And it not only contained no express provision calling for the use of force but even purported to require the expulsion of members who conspired to overthrow the Government by force.

However, that the Constitution was in truth a charter of violence is demonstrated by a mass of evidence that it accomplished a "reconstitution" of the Party as it existed prior to the C. P. A. interlude and again dedicated itself to Marxism-Leninism. Thus there was evidence that at a school sponsored by the old Party in 1939 of which the appellant Stone was the leader, co-conspirator Flynn was followed as a lecturer by another emissary of the Party, Bittleman, who said (*inter alia*) that, the working class throughout the world and in America needed a Party of a new type, a Party that was well disciplined, a Party based in the fundamentals of Marxism-Leninism, a Party that was able to mobilize and organize the people *to overthrow their own government*, a Party that was able to through the dictatorship of the proletariat, smash the rule of the capitalist class in their own government and in its place *set up a new form of government*, the dictatorship of the proletariat. Bittleman further said that he was sure that the students understood by that time that the basic foundation of Marxism-Leninism was the dictatorship of the proletariat, and that it was the dictatorship of the proletariat that guaranteed that

the Party's drive for power would be successful. *It guaranteed that the Party would mobilize the workers to overthrow their own government. It guaranteed, through force and violence, that the old remnants of the capitalist class would be destroyed* and it guaranteed that the new form of government under the leadership of the Party would continue to reorganize the government of the country that was overthrown. Bittleman further stated that he believed by now that the students understood the necessity for understanding Communist theory, the theory of Leninism, which is the experience of the working class of the world as presented in the writings and teachings of Engels, Marx, Lenin and Stalin and *that the students understood that Leninism could be applied and used by the Communist Party in every country of the world to organize and mobilize the people to overthrow one's government.*

Such were the teachings and objectives to which the Party returned upon its reconstitution in 1945.

The Constitutional express dedication to Marxism-Leninism necessarily imports that the violent overthrow of government was a Party objective. The Party generally, and the defendants and their co-conspirators in particular, recognized Marx, Engels, Lenin and Stalin as authoritative exponents of the Marxist-Leninist classics.[1] Although Marx, writing in the mid-nineteenth century, may have believed that socialism could be achieved in the United States without violence, the writings of Lenin and of Stalin, who was living and in power until long after the conspiracy charged was formed in 1945, plainly teach that for that end the violent overthrow of the United States is necessary. Stalin wrote:

"Lenin is right in saying: 'The proletarian revolution is impossible without the forcible destruction of the bourgeois state machine and the substitution for it of a new one.' "

And again:

"Marx's qualifying phrase about the Continent gave the opportunists and Mensheviks of all the countries a pretext for proclaiming that Marx had thus conceded the possiblity of the peaceful evolution of bourgeois democracy into a proletarian democracy, at least in certain countries outside the European continent (England, America). Marx did in fact concede that possibility, and he had good grounds for conceding it in regard to England and America in the 'seventies' of the last century, when monopoly capitalism and imperialism did not yet exist, and when those countries, owing to the special conditions of their development, had as yet no developed militarism and bureaucracy. That was the situation before the appearance of developed imperialism. But later, after a lapse of thirty or forty years, when the situation in those countries had radically changed, when imperialism had developed and had embraced all capitalist countries without exception, when militarism and bureaucracy had appeared in England and America also, when the special conditions for peaceful development in England and the United States had disappeared— then the qualification in regard to those countries necessarily could no longer hold good.

\* \* \* Today, both in England and in America, the 'preliminary condition for every real people's revolution' is the smashing, the destruction of the 'ready-made state machine' (brought in those countries, between 1914 and 1917, to general 'European' imperialist perfection)."

Lenin in his writings adopted Engels' definition of "revolution," *viz.:*

---

1. The appellant Ekins testified that Party instruction contained in these "classics" came from "the horse's mouth."

" * * * Revolution is undoubtedly the most authoritative thing possible It is an act in which one section of the population imposes its will on the other by means of rifles, bayonets, cannon, i. e., by highly authoritative means, and the victorious party is inevitably forced to maintain its supremacy by means of that fear which its arms inspire in the reactionaries * * *."

There was credible evidence that the provision in the Constitution of 1945 proscribing, under pain of explusion, advocacy of violence, was a sham and a blind to conceal the real purpose of the Party. And for its devastating impact on the sincerity of that provision it is significant that this same Bittleman without sacrifice to his standing as a Party member, in the December, 1949, issue of the magazine "Political Affairs" which received wide distribution not only in Connecticut but also throughout the Party generally, published an article asserting that Stalin's History of the Communist Party of the Soviet Union "is a fountain-head of Marxist-Leninist knowledge * * *" and "a *guide to* Marxist-Leninist *action* * * *" embodying "the theoretical and *programmatic* positions of Marxism-Leninism." (Emphasis added.) And he quotes Stalin as saying "one must be a revolutionist, not a reformist; one must follow and practice the policy of class struggle in all fields, not of class collaboration."

The Connecticut Branch of the Party and its officers did not stand aloof from the Party policy of violent overthrow. In June of 1945, Andrew Onda, a named co-conspirator who then was President of the C. P. A. of Connecticut, at Bridgeport and New Haven meetings of C. P. A. advocated return to Marxism-Leninism and attacked Browder's revisionism because it contained no revolution which, he said, in the Communist sense meant sudden and violent death and seizure of the Government overnight. One Kreas, later a member of the State Committee of the Party, supported Onda's advocacy of violence and revolution. Shortly thereafter, at the State Convention of C. P. A. in Bridgeport, attended by about 100 persons, including the appellant Goldring, Onda urged members to establish Marxist-Leninist classes and to put the Party program into practice; and another delegate had stated that a peaceful transition to socialism was impossible. It was then voted to accept the National Resolution referred to above and Onda was elected to represent the C. P. A. of Connecticut at the forthcoming National Convention (which took the *unanimous* action described above).

In August 1945 the C. P. A. of Connecticut held a convention at Bridgeport at which the State C. P. A. was dissolved and the Communist Party in Connecticut was reconstituted as a Marxist-Leninist Party in line with the action taken at the National Convention. The State Convention elected a State Committee and voted to initiate Marxist-Leninist classes. Thereafter the Party in Connecticut proceeded to implement within the state the general plans and policies of the National Party. It operated under the Party principle of "democratic centralism" whereby all decisions of the National Convention, mandated to the National Committee between Conventions, were obligatory on all members of the Party throughout the United States. Representatives of the National Party, including Pittman, Betty Gannett, Siskind, Elizabeth Flynn, Beitenkapp, Levine, Wilkerson, and Stachel spoke at Party meetings in Connecticut. In 1947, Henry Winston came to Connecticut and, during dinner with the appellant Taylor, discussed Party policies. The same year, Stachel, addressing a local party gathering in New Haven, stated that the strategy of the Party was to destroy capitalism and establish a dictatorship of the proletariat. For many of the above-mentioned Connecticut classes in Marxism-Leninism, the local teachers distributed and taught from an outline based upon "The Fundamentals of Marxism," drafted by and distributed from the National Office. And later, with·

in the indictment period, the appellants who were leaders in the State Party, gave unquestioning obedience to an order from the National Office requiring them to go into a hidden underground apparatus and personally bestirred themselves to implement the National policy of union infiltration.

Taking into account the offices which the appellants (other than Stone) held in the State apparatus and the offices held by Stone and the named co-conspirators in the National organization, the unbroken cooperation in different lines of activity between the National Party and the State Party, the numerous contacts between the appellants and officers and representatives of the National Party, the nature of the activities undertaken by the appellants in implementing the policies of the National Party and the documentary evidence showing that violent overthrow was a Party objective, the jury, in my opinion, could properly find the existence of the conspiracy charged.

But my brothers say that proof of the conspiracy charged is insufficient for lack of proof of advocacy, and especially advocacy which incites to action, citing Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, I disagree. I think that no-

where do the convictions now on appeal conflict with Yates. Certainly the charge below was not subject to the defect which was found in the Yates charge: the Silverman jury was plainly instructed that, to convict a defendant, the Government must prove as one element of the offense that while a member of the conspiracy to teach and advocate violent overthrow he had "knowledge of its unlawful purpose" and had the "intent that such teaching and advocacy be a rule or principle of action, and with the intent that such teaching and advocacy be in language reasonably and ordinarily calculated to incite persons to action." [2] This was the very instruction approved in Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed 1137, for lack of which the convictions in the Yates case were reversed. Not even the appellants criticize the judge's charge which in my opinion was lucid, fair and adequate in every respect.

I turn, therefore, to examine the record for evidence of advocacy of action in the light of the Yates opinion. I note that the appellant Ekins, who alone of the defendants below took the stand in his own defense, testified on direct examination that his understanding of Marxism-Leninism was illustrated by passages in the History of the Commu-

---

2. This instruction was supplemented in the Silverman charge by the following:

"The words 'rule or principle of action' refer to the nature of the things to be advocated. They mean that the advocacy must be a rule or principle which the alleged co-conspirators intend and calculate people will act upon, and this rule or principle must call for overthrow and destruction of the Government by force and violence as speedily as circumstance will permit.

"The words 'reasonably and ordinarily calculated to incite' refer to the nature of the words to be used. They mean words which would arouse or stir a reasonable person to act, and not merely to study or think things over; and 'to act' means simply to do something affirmative in furtherance of overthrowing and destroying the government of the United States by force and violence as speedily as circumstances would permit. It need not be shown the words actually had that

effect on anyone but that the words are such as are reasonably and ordinarily calculated to have such an effect and were intended to have such effect.

\* \* \* \* \*

"No intent such as is charged in this case could be inferred from the teaching of the abstract doctrine of overthrowing and destroying the Government by force and violence or by teaching a course on the principles, doctrines and implications of Marxism-Leninism or Communism.

"The expression of a belief or opinion that the violent overthrow and destruction of the Government is probable or inevitable does not constitute teaching or advocacy. Likewise, prediction or prophecy is not advocacy. The Smith Act is not concerned with the violent overthrow and destruction of some imaginary future government which would not permit the majority of the people freely to select their form of government through the ballot box."

nist Party of the Soviet Union from which he read to the jury the following:

> "*Mastering the Marxist-Leninist theory means* assimilating the substance of this theory and learning *to use it in the solution of the practical problems of the revolutionary movement* under the varying conditions of the class struggle of the proletariat.

> \* \* \* \* \* \*

> "The Marxist-Leninist theory is not a dogma, but *a guide to action.*" (Emphasis added.)

Moreover, there was a volume of evidence that the Communist Party of Connecticut in conformity with instructions from the National Board initiated classes for instruction in Marxism-Leninism. This policy was adopted at the very time when the Connecticut Communist in 1945 voted to go along with the Reconstituted Party; it was supplemented by activity in selling Marxist literature. The appellant Dimow under date of February 3, 1947 sent out a letter to "Dear Comrades" advocating that "we must increase our study of the basic Marxist theories" and announcing that "taking steps in this direction, the education committee of the Party has organized a class on the fundamentals of Marxism." In the list of recommended reading material accompanying this letter was Foundations of Leninism, Chapter on Party History of C. P. S. U. At one of these classes the instructor said "Socialism is inevitable because we Communist will fight for it." At another, the appellant Taylor said: "Come the revolution, we'll allow the people to have the church for a little while." And at still another, the appellant Dimow said "that the capitalists sought war with Russia, and if we could stall them off with a peace talk and give us time to develop China, that if they didn't attack us within the next few years why, Russia would be able to take over the capitalistic world." At classes in 1947 in Connecticut, organized by Taylor and attended by Goldring, open only to Party members, conducted by an instructor from the National Office in New York, it was said that Facism could be prevented by the working class led by the Communist Party taking action at the proper time to overthrow the present system of government. At a class in Bridgeport in 1953, the appellant Ekins said "that we Communists support a just war [such as] one where the workers are trying to revolt and overthrow the yoke of capitalism \* \* \*" and "that it was up to us Communists to see that they [the workers] were ready and willing to fight for their freedom."

The advocacy of classes for instruction of Marxism-Leninism as a means to the violent overthrow of the Government was by no means confined to co-conspirators not named as defendants. Also directly and personally involved in such activities were Ekins, Taylor, Dimow and Goldring. Against the background evidence of this case the jury might properly have concluded that these classes were not "a seminar in political theory," to use again Justice Frankfurter's phrase in his concurring opinion in Dennis v. United States, supra, 341 U.S. at page 546, 71 S.Ct. at page 886. Cf. Wellman v. United States, 6 Cir., 227 F.2d 757.[3]

In my opinion, the formation and operation of such classes constituted some evidence of a conspiracy of advocacy in terms of action. As the defendant Ekins testified, "there is a very very close relationship between the immediate and the ultimate aims of the Party." That advocacy to initiate and conduct Marxist-Leninist classes may constitute a call to action finds direct support in the Yates opinion, 354 U.S. at page 331, 77 S.Ct. at page 1083, which recognized the incriminating effect of evidence tying certain of the defendants in that case to Party classes "conducted in the San

**3.** I do not overlook the fact that in Wellman, Wellman v. U. S., on June 24, 1957, certiorari was granted, the judgment of the Court of Appeals was vacated, and the case "remanded for consideration in the light of Yates" and its companion cases. 354 U.S. 931, 77 S.Ct. 1403, 1 L. Ed.2d 1535.

Francisco area during the year 1946, where there occurred what might be considered to be the systematic teaching and advocacy of illegal action which is condemned by the statute." As Justice Harlan said in that opinion:

> "It might be found that one of the purposes of such classes was to develop in the members of the group a readiness to engage at the crucial time, perhaps during war or during attack upon the United States from without, in such activities as sabotage and street fighting, in order to divert and diffuse the resistance of the authorities and if possible to seize local vantage points."

But that was by no means all. There was massive evidence, in connection with the activities of the Connecticut Branch, of advocacy of "industrial concentration," i. e., the Communist infiltration of union labor. In classes and meetings Party members were urged to join unions in key industries concealing their membership in the Party. At most of the monthly meetings of the Connecticut State Committee of the Party from 1945 to 1947, pursuant to advocacy by the National Office the local leaders mapped out plans for infiltrating unions and increasing Communist membership in basic Connecticut industries. The committee at that time was mainly interested in recruiting workers in the brass industry (so vital to our national munitions potential) in Waterbury and Bridgeport; as a result of many discussions, the Party assigned the State Secretary to direct infiltration in Bridgeport and a full time salaried organizer to the Waterbury area. In that connection the State Committee recommended that the local city branches be broken down into cells or clubs for particular industrial corporations, such as the club in the General Electric plant in Bridgeport, and urged members to take jobs not only in the brass industry but also in Pratt & Whit-

ney in Hartford (so essential to our aviation potential). At the State Committee meetings reports were made on the progress of this program of "industrial concentration"; local leaders were criticized for lack of greater progress in infiltration into the principal union in the brass industry; this policy of "industrial concentration" was generally discussed and reports of the industry-branches were given.[4]

In the General Electric club the leaders normally conducted a caucus in advance of union meetings[5] at which the Communist members, according to testimony of a Government witness, "agreed on a program of action that should be taking place at the next union meeting," and "followed out the agreed upon program at the next union meeting." This was in accordance with the order of the state chairman of the Party who said that "the Party policy was that once a program had been agreed upon by the members that was the obligation of all the members to follow up that program." Slates of persons to be nominated for union office were agreed on at such meetings of the Communist locals and with Communist support Communists were thus elected to union office in the General Electric union. In a New Haven meeting in 1947, Stachel, a representative of the National organization, stated "that the Party's main strategy today was to attach ourselves to many groups and organizations in order to curb capitalism whenever possible." And in answer to a question by the appellant Goldring he advocated "that we should always recruit as many among the working class as possible." In a Bridgeport committee meeting in 1953, Goldring is reported to have said that he knew it was difficult for women members, especially those with children, to go to work, but that "it was necessary for these women to make a sacrifice, of even hiring baby sitters, if necessary, for their children, so that they could go into the basic industry in the

---

4. This evidence came in part from a Government witness who at the time was a member of the State Committee.

5. Goldring was reported to have attended such a caucus.

area * * *. This is the only way that the Party can get its program to the masses in the shops."

The call for industrial concentration continued well into the indictment period. In January 1953, a special meeting was called of the General Electric cell in Bridgeport. The appellants Taylor and Goldring were present. Taylor introduced the appellant Stone as "Comrade Ruth, a member of the National Committee of the Communist Party." She stated that the purpose of the meeting was to formulate plans for concentration in the General Electric plant. She was reported as having said: "The best way to accomplish this * * * is by getting a person who is not known as a member [6] of the Party to infiltrate the leadership of the union in the General Electric plant." Goldring agreed that the Party should bring in more members from the outside into the plant to work. Stone then is reported to have added that the Party "should make very effort to locate this person who was not known as a Party member or even a left wing [sic] to infiltrate the leadership of the union, and that we in Bridgeport should get more people into some of the key departments in the shop as the maintenance department and the powerhouse." A month later another meeting was held at Bridgeport. The same appellants were present. Stone announced a change of tactics: thereafter the members were to have nothing to do with the United Electrical Workers Union in G. E. because that union was dead; instead they were to join and work in the "right wing" union at the plant.

There was a meeting of an industrial cell in New Britain, in March 1953, organized for the "Niles-Bement-Pond" plant. Taylor attended the meeting and after informing the cell members that a Local 405 U.A.W., C.I.O. election was pending urged two members to "get themselves elected" to union offices. He was reported to have said "You go back, make sure you find someone that will nominate you. I don't care how you do it. Make sure you get yourselves elected into office." In May 1954, the witness Pires, then a Party member, was told by one Vittoria, the Hartford chairman, that Taylor had ordered Pires not to attend any Communist front meetings in the future and was to concentrate on Niles-Bement-Pond alone. The same month, a regional trade council meeting of the Party was held in New Rochelle, New York. The appellant Stone, who led the meeting, received industrial concentration reports on New Jersey, Connecticut and Boston.

There was further proof of advocacy of action in connection with the organization and continuing functioning of a carefully conceived underground apparatus as a part of the conspiracy charged. This was an accepted communist tactic, to be utilized when the Party was weak and the opposition strong. Lenin pointed out that "during the period of reaction they [the Party] should learn how to retreat properly, how to go underground, how to preserve and strengthen the illegal party, how to make use of legal opportunities of all legally existing organizations, especially mass organizations, in order to strengthen their connections with the masses."

Elaborate plans were formulated and put into effect in New York state by the National Office in 1948. The immediate objective of the plan was to avoid surveillance while allowing the Party to conserve membership strength and continue, and by means of subterfuge and infiltration to maintain and increase Party influence in various sectors of the economy, especially industrial labor. The master plan comprised a pyramidal

6. One of the witnesses, Americo (Amie) Fiori, who had been a labor official in the I. U. E. testified that Stone had approached him in 1947 and solicited him for membership in the Party; that previously he had asked her how far the Party would go in this country to gain their objectives and she had answered "Frankly, Amie, if necessary we'll have bloodshed"; that he refused to join and Stone offered to keep his membership secret if he would join.

organization of three-man cells, each of which appointed a committee to organize and direct cells in successively lower echelons with vertical, but no horizontal, communication between cells. Thus the organization was such that directions could be transmitted, but only downwardly, through a chain of command from headquarters to the lowest echelon without disclosure of other cells and a minimum disclosure of Party membership. By March of 1953, there had been established in Connecticut an underground apparatus which if not identical with that in New York state at least had strong points of resemblance.

In 1951 the Connecticut leaders including Taylor, Ekins and Goldring were instructed to go underground and left their homes and jobs for extended periods. Taylor, the Connecticut chairman, under instructions from the National Office, went to New York, started to wear a hat, grew a bushy mustache, lost considerable weight, assumed the *alias* of Vito, dyed his hair, and started to learn Italian so that he might open a barber shop as a front for Party activities. He was in hiding from 1951 to 1954; during most of this time he was being financed by the National Office and kept in contact with the Communist Party through a courier. Other appellants under similar instructions affected disguises, assumed aliases and went into hiding for their continuing operations.

In February 1954, in anticipation of a Senatorial Committee investigation of Communist infiltration into Bridgeport industries, the entire governing structure of the Connecticut Party was reorganized. A five-man "Concealed State Board" was put in charge of Party activities in Connecticut, subject of course to the National Board. Taylor, who was chiefly responsible for the reorganization, was its chairman; Ekins was the secretary and Goldring was a member.[7] The Government informer Kent was made a member of the Board upon recommendation by Stone and approval by

the National Office. The officers, with the exception of Goldring, were "unavailable persons"; i. e., not to be communicated with by any members of the Party other than superior personnel in the National Office. Goldring was the sole "open Party member" for the state of Connecticut to whom communication might be directed. He was provided with a post office box in Bridgeport, and it was his job to do all the corresponding for the Connecticut Party. The Party in the State also maintained its private communication system whereby secret "drops" were provided by the receipts of messages which were relayed by trusted couriers. The meetings of the Concealed State Committee were held mostly in New York and elaborate precautions were required of, and practiced by, members to prevent discovery of the time and place of such meetings. These security measures were deliberately and immediately designed to avoid surveillance of the F. B. I. and disclosure of Party activities.

In the Yates case there was evidence that "individuals considered to be particularly trustworthy were taken into an 'underground' apparatus and there instructed in tasks which would be useful when the time for violent action arrived." As to this it was held: "we are not prepared to say, at this stage of the case, that it would be impossible for a jury, * * * to find that advocacy of action was also engaged in * * *." 354 U.S. at page 332, 77 S.Ct. at page 1083. In the case now before us the advocacy *of action* seems plain. As advocated by co-conspirators in the National Office the appellants Taylor, Ekins and Goldring forthwith formed an underground apparatus, left their homes and jobs, dyed their hair, took on false names and then under the rigid discipline of the Party carried on Party activities throughout the principal cities of the State of Connecticut under the supervision of "Comrade Ruth," the appellant Stone, who when previously asked as to

7. The other member was a representative of an international union having locals in the brass industry.

how far the Party would go had replied: "Frankly, * * * if necessary we'll have bloodshed." In connection with the proofs of a conspiracy of advocacy, surely the jury might treat the appellants' furtive conduct in connection with the "underground" as evidence that the conspiratorial advocacy was in terms which called for action.

To summarize. These appellants who were the leaders of the Party in the State of Connecticut and who submitted themselves to the rigid discipline of the Party which was under the control of their co-conspirators in the top echelon of the National organization, joined in an agreement not only to advocate the duty and necessity of violent overthrow as exemplified in the Marxist-Leninist classics but also themselves promptly and continually throughout the conspiracy period took prompt action to put into effect such advocacy by initiating and supporting classes in the Communist classics. They also joined in advocating the Party policy of industrial concentration and in advocating Party operation through an underground apparatus. They personally and over a period of years extending into the indictment period responded to such advocacy by prompt action in practicing the policy of industrial concentration and the formation of an underground apparatus through which they managed the Party throughout Connecticut.

To be sure, their advocacy and their action did not involve present use of dynamite or bayonets. But the evidence amply supported a finding that their systematic advocacy and practice of propaganda, industrial concentration and furtive underground operation were all advocated and practiced as a means to the accomplishment of state socialism by violent overthrow of the existing government; that, as the appellant Ekins put it, these immediate objectives had "a very very close relationship to the ultimate aims of the party." In the Yates opinion it was said that the test of *advocacy of action*, which is essential to the offense denounced by the Smith Act,

is "that those to whom the advocacy is addressed must be urged to *do* something, now or in the future, rather than merely to *believe* in something." I think the jury's verdict was in no respect inconsistent with that test.

My brothers concede that on the evidence "it is reasonable to find that the bulk of the Party membership was in agreement on the desirability of the Party some day leading a violent insurrection against the Federal Government" and that "[t]he record would thus afford proof of seditious conspiracy or conspiracy to commit insurrection or revolution." But they hold that there was a total failure to prove conspiracy to violate the Smith Act because "[t]his line of proof at most establishes the conspirators' long-range objectives; it does not cast light on their agreement as to tactics to be pursued in the period 1952–1955." I agree except as to the last-quoted clause. As to that, it appears to me that the evidence of continuing advocacy as to the necessity for violent overthrow, of advocacy of union infiltration, and of advocacy of Party operation by an elaborate underground apparatus casts a brilliant light on their agreement as to 1952–1955 tactics, which silhouettes a present program of integrated action.

My brothers also say the critical issue is whether the appellants or the Party "engaged in criminal speech during the three years prior to the indictment." I find the phrase "criminal speech" neither in the Smith Act nor in the Conspiracy Act. But I do find an abundance of evidence to show that within that period the appellants and their co-conspirators agreed to advocate the violent overthrow of our government and to advocate a present program of action directed to that end. In my opinion, the evidence of conspiracy was enough to sustain the convictions without any collision whatever with the Constitutional guarantees of free trial and free speech.

The appellants have pressed on appeal several other claims of error. All of these I have carefully studied and find without merit. However, since my

brothers order the convictions reversed and the appellants acquitted on the sole ground that there is insufficient evidence of a conspiracy having as its object advocacy of action, I too will not extend my discussion beyond that issue. I would affirm as to all appellants.

On Petition for Rehearing before the Court *en banc*.

PER CURIAM.

The petition for *en banc* procedure, having been submitted at Judge HINCKS' request to all the circuit judges of the circuit who are in active service, was favored only by Judges MEDINA and HINCKS, Chief Judge CLARK and Judge WATERMAN being opposed, and Judges LUMBARD and MOORE disqualifying themselves and not voting. Since a hearing *en banc* has not been ordered by a majority of said judges, the petition is denied by the division of the court which heard the original appeal, 28 U.S.C.A. § 46(c), Judge HINCKS dissenting.